UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| BRIAN P LOGARBO | CIVIL ACTION NO. 22-cv-831 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| LOUISIANA STATE UNIVERSITY HEALTH SCIENCES CENTE ET AL. | MAGISTRATE JUDGE HORNSBY |

## REPORT AND RECOMMENDATION

**Introduction**

Brian Logarbo ("Plaintiff") filed suit in state court after he was terminated from a medical residency program at LSU Health Sciences Center ("LSU-HSC"). His original petition named LSU-HSC as the only defendant. It referred to the U.S. Constitution but appears to have relied primarily upon state law. Plaintiff filed an amended petition that added several individual defendants and set forth specific counts, some of which specifically invoked the U.S. Constitution and 42 U.S.C. § 1983. Defendants removed the civil action based on federal question jurisdiction.

Defendants filed a motion to dismiss. Plaintiff's response included a request that he be allowed to file another amended complaint if the court found his pleading lacking. The undersigned allowed Plaintiff an opportunity to amend and "plead his best case." The order noted that Plaintiff, in light of the attacks on his federal claims, might wish to consider dropping them and relying solely upon his state law claims. Plaintiff was advised that doing so would likely result in remand of the case. Doc. 22.

Plaintiff filed a second amended complaint (Doc. 29) and elected to maintain his federal claims. Before the court is the Defendants' Motion for Partial Dismissal (Doc. 30) that attacks all of Plaintiff's federal claims and all but one of his state law claims. For the reasons that follow, it is recommended that the motion to dismiss be granted in part by dismissing with prejudice all federal claims for failure to state a claim on which relief may be granted. The court should then decline to exercise supplemental jurisdiction over the state law claims and remand the case to state court.

**Relevant Facts**

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007). The court may also consider exhibits attached to a complaint, which are part of the complaint "for all purposes." Fed. R. Civ. P. 10(c). That includes the assessment of a Rule 12(b)(6) motion. U.S. ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 375 (5th Cir. 2004). Accordingly, the court will fairly summarize the facts set forth in Plaintiff's second amended complaint and its exhibits.

Plaintiff entered into a one-year medical residency agreement with LSU-HSC that began on July 1, 2020. He was competent and performed his duties with a "patient first" mentality, but he learned that his "meticulous care for his patients began to rub some of the staff the wrong way." Plaintiff observed that members of the nursing staff delayed care or provided improper care, and he spoke to them about it. His discussions apparently hurt the feelings of the nurses, so he "altered his communication style in an effort to meet the

emotional needs of his colleagues and even voluntarily attended counseling to work on the same." Second Amended Complaint, Doc. 29, ¶¶ 5-7.

Dr. Lauren Beal was the director of the residency program. She asked Plaintiff to attend weekly luncheons with her and Plaintiff's colleagues. The meetings generally took place on Mondays at noon and included educational videos. Plaintiff made every reasonable effort to attend, but there were occasions when he was required to miss some of the luncheons because of high patient volume. Dr. Beal initially claimed to understand that Plaintiff was with patients, but she later tried to use his absences to further a personal agenda to "target" him. ¶¶ 8-9.

Plaintiff frequently asked Dr. Beal to move the luncheons to a less demanding time slot, and he made it clear that he would watch the videos even if the luncheon was not moved. Dr. Beal began to criticize Plaintiff for missing the luncheons and even told him on occasions to leave the bedside of patients and participate in the luncheons. The last time Plaintiff raised his concerns about the needs of his patients, Dr. Beal screamed at him over the phone and accused him of not having his priorities in order. ¶ 10.

LSU-HSC had a monthly Process Group. Plaintiff refers to it as "social hour," and says participants would share personal stories and discuss things such as sports and entertainment. A counselor usually facilitated the discussions. Plaintiff was once unable to attend due to the needs of a patient, and Dr. Beal scolded him. ¶ 11. Plaintiff contends that he never received any negative feedback from his colleagues in the residency program, and at the program's Christmas party his colleagues made glowing remarks about him. Those remarks were written on notecards that bore Plaintiff's name. Colleagues wrote

things such as, "I appreciate your love of academics" and "You are passionate & enthusiastic, which I know can be channeled to achieve great things within the program." ¶¶ 11-12.

Plaintiff states that he was "very timely" and typically the first person on his team to arrive. He was late to work only once, due to a mistake with his alarm clock. ¶ 13. Plaintiff displayed a passion for medical research and made efforts to publish a research paper. Dr. Beal refused to support the research, but Plaintiff on his own successfully published the research. ¶ 14.

Dr. Beal insisted on communicating with members of the residency program using WhatsApp. Plaintiff states that the app was "ill-suited to a timely and constructive exchange of information," and he volunteered to create a newsletter that would contain relevant announcements rather than the personal stories and irrelevant comments that participants posted on the app. Dr. Beal rebuffed his request. ¶ 15.

Dr. Beal called Plaintiff to a meeting on February 17, 2021 and handed him a termination letter, which came as a complete shock to Plaintiff. Plaintiff alleges that the letter was filled with inconsistencies or inaccurate statements, and he deems it arbitrary, capricious, without probable cause, and without due process. ¶¶ 16-19. The letter from Dr. Beal mentioned a remediation plan put in place in September 2020 after nursing staff filed two complaints that Plaintiff engaged in unprofessional behavior, including cursing at a nurse at the patient's bedside when the nurse attempted to explain why an NG tube had not been placed as ordered. The remediation plan was described as designed to work on communication issues and Plaintiff's ability to deal with anger and frustration.

The termination letter included a timeline of events before and after the remediation plan was put in place. The timeline included that Plaintiff changed a morning report topic without notifying his co-intern who was presenting with him that day. Plaintiff's response was that the colleague was not "on his level" and that he would not change how he handled the situation. He said that he preferred to work on his own. When told that he could not work alone in a team setting, he stated, "You haven't met me; yes, I can." It was noted that Plaintiff was reminded several times to create a PEAC account and perform certain modules, but he had not done so after multiple reminders over the course of several weeks. On one occasion he was 40 minutes late to internal medicine rounds and was falling asleep on rounds. Dr. Beal noted that Plaintiff had failed to meet the 70% conference attendance requirement, falling short significantly at only 30% attendance. When Dr. Beal texted him about his tardiness and attendance, he suggested that she change the time of the conference and wanted to argue. In spite of being told to regularly check WhatsApp for important communications, Plaintiff consistently neglected to do so and missed announcements such as clinic closures and plans for inclement weather.

The termination letter noted that peer evaluations described Plaintiff as rude, unprofessional, and very difficult to work with. He scored two out of nine for effective communication and accepting responsibility. The timeline noted that Plaintiff once prescribed Ambien to an 80-year-old patient, although this was contraindicated. He also told the patient that the prescription would be waiting at the front desk, but he never put it there. When confronted with the situation, Plaintiff stated (contrary to the only note he

placed in the chart) that he told the patient that he would not prescribe the medication to her.

      Dr. Beal's letter stated that the following competencies were deemed to be remedial:

1) Interpersonal and communication skills – based on peer evaluations and feedback, patient complaints, and attending feedback

2) Practice based learning – does not accept feedback at times. Failure to respond and improve based on feedback provided verbally and in writing

3) Professionalism – tardiness, poor conference attendance, showing respect for peers and attendings, failure to accept responsibility, has little insight into behavior

4) Patient care – based on patient complaints, poor time management in clinic, inappropriate prescription for a geriatric patient, lack of empathy

5) Systems based practice – poor skills working with a team, utilizes communication strategies that hamper collaboration and teamwork; verbal and/or nonverbal behaviors that disrupt effective collaboration with team members

The letter stated that the "committee voted for immediate dismissal with no credit to be given for this year due to deficiencies in professionalism, which even without the other competencies qualifying as remedial, can result in grounds for dismissal." The vote was unanimous. The decision was said to be based primarily on prior deficiencies in addition to concern for Plaintiff adversely affecting the morale of the other residents, as well as continued or worsening performance if Plaintiff were to finish the year. Dr. Beal wrote that Plaintiff would likely not merit credit for the intern year "as he at the very least fails for professionalism."

      Plaintiff submitted a request for reconsideration to the Chairman of the Department of Medicine, Dr. Steven Bailey. His appeal set forth more than six pages of single-spaced

replies to the matters raised in the termination letter. Dr. Bailey issued a short letter that stated he had reviewed the appeal and upheld the committee's decision to dismiss Plaintiff from the program. ¶¶ 21-22 & Exhibits C & D.

Plaintiff was given a deadline of March 15, 2021 to appeal that decision to the Appeal Review Committee. On the night of March 14, Plaintiff received news that his father unexpectedly passed away. Plaintiff spoke with Dr. John Vanchiere at LSU-HSC regarding an extension of time to file the appeal. Dr. Vanchiere told Plaintiff that an extension of time was granted; Plaintiff states that this extension "was not limited to a specific date." Dr. Bailey assured Dr. Vanchiere that the extension "would not be a problem."

After grieving the death of his father for several weeks, Plaintiff submitted his appeal on April 9, 2021. But on April 19, 2021 LSU-HSC rejected the appeal as untimely. The rejection letter stated that no one had written documentation of the extension of time Plaintiff indicated was granted. Assuming the undocumented extension was granted on March 15, and even allowing for the two-day observation of the Easter holidays, the request for review was deemed not timely received. Plaintiff responded with an affidavit from Dr. Vanchiere in which the affiant stated that he asked Dr. Bailey if an extension of the appeal deadline was possible, and Dr. Bailey assured him that an extension would not be a problem. "Dr. Bailey did not tell me how long of an extension he was willing to give Dr. Logarbo." LSU-HSC again refused to consider the appeal. ¶¶ 23-29; Exhibits E-G.

Plaintiff's complaint outlines and quotes from the residency manual that is titled GMEC Manual: Policies and Procedures 2019-2020. The manual states that LSU-HSC is

committed to due process, which is defined as allowing an individual notice of proposed action and with the allegations and evidence against him, an opportunity to present his side of the story to the decisionmaker, and—unless the offense is egregious—be given the opportunity for improvement. The manual states that if the program director determines dismissal is warranted, the director shall notify the resident and certain offices, and the director "shall also provide any written documentation leading to dismissal." ¶¶ 30-31 & Exhibit H.

The manual provides an appeals process, which is described as being to ensure that the resident has been fairly evaluated according to departmental standards, been made aware of his deficiencies and (unless the offenses are egregious) be given the opportunity to correct them. The appeals process following a decision is first an appeal to the department chairman, and second an appeal to the Appeal Review Committee. At the final step of the appeal, the applicant is permitted to use witness testimony, present evidence, and even select one of the panelists. ¶¶ 32-33.

**Rule 12(b)(6) Motion to Dismiss**

Rule 12(b)(6) authorizes the filing of a motion to dismiss on the grounds that a complaint fails to state a claim upon which relief can be granted. Claims may be dismissed under the rule on the basis of a dispositive issue of law. Jackson v. United States Dep't of Hous. & Urb. Dev., 38 F.4th 463, 466 (5th Cir. 2022). The court must accept the well-pleaded facts as true and view them in the light most favorable to the plaintiff. Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co., 29 F.4th 252, 256 (5th Cir. 2022). As noted above, the exhibits attached to a complaint are part of it for all purposes, so the court

may consider them when assessing a Rule 12(b)(6) motion. Fed. R. Civ. Pro. 10(c); U.S. ex rel. Riley, 355 F.3d at 375.

**Procedural Due Process**

Count 4 of Plaintiff's second amended complaint seeks a declaration that he had a property or liberty interest in his resident position that was deprived in violation of his Fourteenth Amendment rights to procedural and substantive due process. This claim targets LSU-HSC. Count 5 is a claim for damages under 42 U.S.C. § 1983 that targets several individuals such as Dr. Beal, Dr. Bailey, and the members of the committee that voted to dismiss Plaintiff. He alleges that each of the individuals acted arbitrarily and capriciously in light of the circumstances, which violated his Fourteenth Amendment rights.

The court will first address Plaintiff's claim that his procedural due process rights were violated. "In the context of due process, medical residents are students rather than employees of the hospital." Ekmark v. Matthews, 524 Fed. App'x 62 (5th Cir. 2013). "It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program." Davis v. Mann, 882 F.2d 967, 974 (5th Cir. 1989). In recognition of the complex student-faculty relationship, students are not entitled to the same due process protections as are employees. Shaboon v. Duncan, 252 F.3d 722, 730 (5th Cir. 2001).

The Fifth Circuit distinguishes between the process required for students facing disciplinary versus academic actions, with academic decisions requiring far less stringent procedural requirements. Ekmark, 524 Fed. App'x at 64, citing Bd. Of Curators of Univ.

of Mo. v. Horowitz, 98 S.Ct. 948 (1978). The physicians and administrators directing residency programs are in the best position to determine which candidates are suited to progress through the program and have satisfactorily completed the requirements for certification. Davis, 882 F.2d at 974. "Adverse academic actions against medical residents require only the minimum procedure of notice and not a hearing." Ekmark, 524 Fed. App'x at 64, citing Horowitz.

Plaintiff argues that his termination was based on disciplinary rather than academic reasons, which would entitle him to additional procedural rights. Shaboon stated that the medical resident in that case could prevail only if she was dismissed "solely for behavioral misconduct." Shaboon, 252 F.3d at 731. The resident's dismissal was academic if it "rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal." Shaboon, 252 F.3d at 731, quoting Horowitz, 98 S.Ct. at 955.

In Horowitz, the Court found that a medical student's dismissal was academic even though the school warned her to improve her personal hygiene and attendance as well as her academic performance. The resident in Shaboon received several negative evaluations, suffered from mental problems, and stopped taking medication. She was deemed not ready to treat patients. The Fifth Circuit said that the resident's intransigence might suggest that her dismissal was disciplinary, but "her refusal to acknowledge and deal with her problems furnished a sound academic basis for her dismissal." Shaboon, 252 F.3d at 731. As a matter of law, therefore, she was not entitled to any type of hearing and could not claim that her supervisor violated a liberty interest in her residency. Id. Similarly, a dental

resident dismissed for performance deficiencies that included tardiness and missed appointments with patients was dismissed in what the Fifth Circuit described as "an academic dismissal context." Davis, 882 F.2d at 975.

Medical residents are no longer in a classroom/grades setting, and courts have classified a wide variety of reasons for dismissal from their medical training program as being academic in nature. In addition to the examples cited above, there are Mathai v. Bd. of Sup'rs of La. State Univ., 959 F. Supp. 2d 951, 959 (E.D. La.), aff'd, 551 Fed. App'x 101 (5th Cir. 2013) (dismissal of medical student for failure to comply with a drug testing agreement was an academic dismissal); Shah v. Univ. of Texas Sw. Med. Sch., 54 F. Supp. 3d 681, 694-95 (N.D. Tex. 2014) (dismissal of medical student for lowest possible grades in "professionalism and interpersonal skills" was academic dismissal); and Cordova v. Louisiana State University, 2020 WL 7413878 (W.D. La. 2020) (Cain, J.) (nonrenewal of resident's contract "was based on professional evaluations of his competencies as a physician in training rather than on the violation of any code of conduct provision" so was not disciplinary). The areas of deficient performance in Cordova included patient care and medical knowledge, but also interpersonal and communication skills and professionalism.

The termination in this case was based on perceived deficiencies in interpersonal and communication skills, practice-based learning, professionalism, patient care, and systems-based practice. There was no allegation of a violation of the code of conduct or any kind of inappropriate behavior outside of the patient care and educational settings. The facts alleged by Plaintiff reflect that his termination was based on academic rather than disciplinary reasons.

The court finds that the procedural steps alleged by Plaintiff did not violate the Due Process Clause of the Fourteenth Amendment. Exhibit B to plaintiff's complaint indicates that Plaintiff was placed on probation and given a remediation plan in December 2020. The residency manual, attached to the complaint as Exhibit H, states that probation is the formal notification to the resident that his performance is not satisfactory. Written notification is to include six elements: 1) reason for any extension of the program, 2), what the resident did not do to meet expectations, 3) goals and objectives the resident should meet, 4) timeframe of meeting the goals and objectives, 5) communication or progress report of meetings to communicate progress or lack of progress, and 6) what happens if the resident does not meet the goals and objectives. The manual warns that failure to meet any standard after this formal warning may result in dismissal from the residency program. Plaintiff does not attach the probation letter referred to in the termination letter, but he does not deny receiving one or that it notified him of how he did not meet expectations.

The committee found that, in the January and February that followed the December 15 probation warning and remediation plan, Plaintiff was observed to be late for rounds, falling asleep on rounds, exhibiting time management problems, was rated as unprofessional and difficult to work with, did not perform learning modules on schedule, failed to meet conference attendance requirements, and neglected to check in on communications. The committee also found that Plaintiff erroneously prescribed a medication to an elderly patient and then denied that he did so despite his chart note to the contrary. The committee voted unanimously for immediate dismissal, and they gave

Plaintiff a letter that described in detail his perceived deficiencies and notified him of his right to appeal the decision.

Plaintiff did appeal the decision to the first level of review. When that was denied, he lodged an appeal to the third and final level, but it was deemed untimely. There is a dispute over whether an extension was granted that would render that appeal timely, but regardless of how that issue might be resolved, Plaintiff was afforded notice in the form of the remediation plan and again by the termination letter. The probation warning, remediation plan, and notice of reasons for termination, plus an opportunity for appellate review, satisfied the minimum notice procedure required by due process in this academic termination setting.

Another aspect of Plaintiff's procedural due process claim is based on a provision in the resident manual. It states that if the program director determines dismissal is warranted, she shall give notice in writing and "also provide any written documentation leading to dismissal." The termination letter described the grounds for dismissal in detail, but Plaintiff alleges that it violated due process because written documentation supporting it was not attached.

Plaintiff does not cite to any jurisprudence that holds that due process requires such documentation be served. Rather, his claim relies solely on the resident manual. "[A] university's failure to comply with its own rules does not give rise to a constitutional violation as long as the aggrieved party 'was in fact given the process guaranteed him by the Constitution.'" Pham v. Blaylock, 712 Fed. App'x 360, 363 (5th Cir. 2017), quoting Levitt v. Univ. of Tex. at El Paso, 759 F.2d 1224, 1231 (5th Cir. 1985). See also Ekmark,

524 Fed. App'x at 64 ("Even if a formal hearing was required by UTHSC policy, the UTHSC rules do not establish the constitutional floor of due process.").

The facts set forth in Plaintiff's complaint indicate that he was given notice of his perceived deficiencies and an opportunity to correct them. He was then notified in detail of the reasons for his termination, and he was afforded a route to appeal that decision. That was sufficient to comply with the requirements of procedural due process in this setting.

**Substantive Due Process**

Plaintiff also alleges that the actions of LSU-HSC and the individual defendants violated his right to substantive due process. Substantive due process under the Fourteenth Amendment protects individuals against conduct that "shocks the conscience." Pham, 712 Fed. App'x at 364, quoting Rochin v. California, 72 S.Ct. 205 (1952). In the context of dismissal from an academic program, substantive due process amounts to a constitutional protection against arbitrary dismissal. Pham, citing Regents of Univ. of Mich. v. Ewing, 106 S.Ct. 507 (1985). "When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment [and] may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Ewing, 106 S.Ct. at 513.

The facts alleged by Plaintiff surrounding his termination do not shock the conscience. They do not indicate that the decision makers departed from accepted academic norms or failed to exercise professional judgment. Rather, the termination letter

demonstrates that the decision was made conscientiously and with thorough consideration of Plaintiff's record.

Plaintiff alleges in his complaint that the actions did "shock the conscience" or that actions were taken "unlawfully and improperly" or were "arbitrary, capricious, without probable cause … in light of the circumstances." Those allegations, however, are mere conclusions rather than facts. In assessing a motion to dismiss, the court must accept as true all well-pleaded facts in the complaint, but a complaint is not sufficient if it offers only "labels and conclusions," or "a formulaic recitation of the elements of a cause of action." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009), quoting Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007). For example, a complaint that described in a couple of paragraphs Fifth Circuit case law and then enumerated the elements of a claim, but nothing more, did not suffice. Terwilliger v. Reyna, 4 F.4th 270, 285-86 (5th Cir. 2021).

Plaintiff's allegations of arbitrary, unlawful, or unreasonable actions are similarly insufficient to state a claim on which relief may be granted. Plaintiff was given the opportunity to plead his best case, and he has alleged actual facts in considerable detail. Those facts do not, however, provide a plausible basis for a substantive due process claim against LSU-HSC or any of the individual defendants. All such claims should be dismissed.

**Federal Claims; the Individual Defendants**

It was recommended above that the court find the complaint does not allege facts to support a viable claim for deprivation of procedural or substantive due process. That recommended resolution affects Plaintiff's claims against LSU-HSC as well as those

asserted against the individual defendants associated with the termination and appeals process. Pham, 712 Fed. App'x at 365 (pharmacy school student's discipline process did not violate the constitution, so the individual university officials were entitled to qualified immunity and dismissal of monetary claims against them).

**State Law Claims**

The undersigned has recommended that all of Plaintiff's federal claims be dismissed for failure to state a claim on which relief may be granted. Plaintiff also asserts state law claims for breach of contract and violation of the Louisiana constitution. The court may exercise supplemental jurisdiction over those state law claims pursuant to 28 U.S.C. § 1367, but Section 1367(c)(3) provides that the court may decline to exercise supplemental jurisdiction if the court "has dismissed all claims over which it has original jurisdiction."

The Fifth Circuit has stated that the general rule is to decline to exercise jurisdiction over state law claims once all federal claims have been dismissed. That is particularly true in the early stages of a case. Parker & Parsley Petroleum Co. v. Dresser Indus., 972 F.2d 580, 587–90 (5th Cir.1992) (district court abused its discretion in retaining jurisdiction over state-law claims following the dismissal of all federal-law claims at a relatively early stage of the case); Phelan v. Norville, 460 Fed. Appx. 376, 382 (5th Cir. 2012) (district court did not abuse discretion when it remanded state law claims, after dismissal of federal claims, less than six months after removal). All federal claims have been resolved at a relatively early stage before the case proceeded beyond the pleadings review stage. The best exercise of the court's discretion in these circumstances is to decline to exercise jurisdiction over the remaining state law claims and remand the case to state court.

Accordingly,

It is recommended that Defendants' Motion for Partial Dismissal (Doc. 30) be granted in part by dismissing with prejudice all federal claims for failure to state a claim on which relief may be granted. It is further recommended that the court decline to exercise jurisdiction over the state law claims and remand the case to the First Judicial District Court, Caddo Parish, Louisiana, where the case was pending as number 631,168.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 29th day of November, 2022.

Mark L. Hornsby
U.S. Magistrate Judge